# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
      **Plaintiff,**

  v.                                                **Case No. 13-CR-086**

**MIGUEL TESILLOS**
      **Defendant.**

## SENTENCING MEMORANDUM

Defendant Miguel Tesillos pleaded guilty to counterfeiting a permanent resident card, contrary to 18 U.S.C. § 1546, and I set the case for sentencing. In imposing sentence, the district court is required to follow a two-step procedure. First, it must calculate the defendant's sentencing range under the advisory guidelines. United States v. Boroczk, 705 F.3d 616, 622 (7th Cir. 2013). Second, the court must hear the arguments of the parties and make an individualized assessment of the appropriate sentence based on all of the factors set forth in 18 U.S.C. § 3553(a). Id.

### I. GUIDELINES

Defendant's pre-sentence report ("PSR") set a base offense level of 11 under U.S.S.G. § 2L2.1(a), added 9 levels because the offense involved more than 100 documents, U.S.S.G. § 2L2.1(b)(2)(C), then subtracted 3 levels for acceptance of responsibility, U.S.S.G. § 3E1.1, for a final level of 17. Because defendant had no prior record, the PSR set his criminal history category at I, for an imprisonment range of 24-30 months. I adopted the PSR's calculations without objection.

## II.  SECTION 3553(a)

Defendant requested a sentence of time-served (about 4 months), while the government advocated a term at the low end of the range.  On consideration of the parties' arguments and the § 3553(a) factors, I found a sentence of 8 months appropriate.  This memorandum sets forth the reasons.

**A.     Section 3553(a) Factors**

Section 3553(a) requires the court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the [advisory] sentencing [guideline] range[;]

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). After considering these factors, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  Id.  While the guidelines serve as the starting point in making this determination, Gall v. United States, 552 U.S. 38, 49 (2007), the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 555 U.S. 350, 352 (2009).

2

**B.     Analysis**

**1.     The Offense**

This case involved defendant's production and sale of counterfeit identification and immigration documents. On March 18, 2013, defendant agreed to sell a cooperating source ("CS") a fraudulent permanent resident card and social security card. Defendant met the CS in a store parking lot to facilitate the sale of the fraudulent documents. The CS provided defendant the name of "Pedro Sanchez," which was to be used on the fraudulent documents, and defendant took a photo of the CS for use on the cards. Defendant left the CS a short time later and drove to his residence in order to produce the fraudulent documents using computer and printing equipment he had in the residence. Approximately thirty minutes later, defendant left his residence and met the CS at another location, where he delivered a fraudulent permanent resident card and social security card in exchange for a payment of $160. Defendant used the photograph he took of the CS on the fraudulent card.

On April 11, 2013, defendant agreed to sell a different CS three fraudulent social security cards, two fraudulent permanent resident cards, and a State of Wisconsin driver's license for $480. The CS provided defendant a sheet of paper with three photographs and fictitious biographical information for use on the documents. As with the previous transaction, defendant returned to his residence to produce the fraudulent documents, then met up with the CS to complete the transaction.

On April 25, 2013, agents executed a federal search warrant at defendant's residence, seizing an assortment of computer, camera, scanning, electronic storage, and printing equipment used by defendant to produce counterfeit identification documents. During a search

3

of the computer seized from the residence, agents discovered approximately 300 individual head-shot photographs, which were consistent with the type of photographs used to manufacture the fraudulent documents.

In his statement to the PSR writer, defendant explained that he had lost his job and was looking for income. He met an associate who told him about the ability to make money by producing false documents for immigrants so they could find work in the country. At first, the associate paid defendant to deliver false documents. Later, another associate who was making documents sold his computer equipment to defendant, and defendant decided to get into the business of making false documents himself. While he rationalized that he was helping people get employment, he was doing it for profit and to support himself, his girlfriend, and her children.

### 2. The Defendant

Defendant was thirty-four years old, with no prior criminal record. Born in Mexico, he came to the United States at the age of eighteen to work. He obtained a false social security card and worked under an alias. His parents were deceased, and his only remaining relative in Mexico appeared to be his brother, who lived in Mexico City and with whom defendant had little contact.

Defendant married in 2003 in the United States, but they separated after just five months of marriage. They never formally divorced, and defendant's last contact with her was in 2006. They had no children. Defendant was in a six year relationship with another woman prior his arrest in this case. She had three children with whom defendant was close, ages ten, seven, and six. However, she had apparently declined to continue their relationship following defendant's arrest. Defendant never had legal status in the United States and faced

4

deportation upon completion of his sentence in this case.

Defendant did not appear to have any significant substance abuse problems or other correctional treatment needs.  He compiled a work record in this country, most recently for a scrap metal processing company from 2010 to 2011, when he was fired after his employer discovered his false identity.

### 3. The Sentence

As indicated, the guidelines in this case called for a term of 24-30 months, and I agreed that a period of confinement was needed to promote respect for the law, provide just punishment, and deter others from producing counterfeit documents.  For several reasons, however, I found a term below the range sufficient.

First, the guideline in this was case was entitled to less respect because it is not based on Sentencing Commission research, study, or expertise.  See Kimbrough v. United States, 552 U.S. 85, 109 (2007).  In its original 1987 incarnation, U.S.S.G. § 2L2.1 set forth a base offense level of 6, with a 3 level enhancement if the defendant committed the crime for profit. In 1989, the Commission raised the base level to 9 but provided for a 3 level decrease if the offense was committed other than for profit.  See United States Sentencing Commission Guidelines Manual, Appendix C, Vol. I 85 (1997) (amendment 195).  In 1992, the Commission added a range of enhancements based on the number of documents involved: 2 levels for 6-24 documents, 4 levels for 25-99 documents, and 6 levels for 100 or more documents.  Id. at 258-59 (amendment 450).  The Commission did not provide a detailed explanation for the change, but it did state that its revision of U.S.S.G. § 2L1.1 ("Smuggling, Transporting, or Harboring an Unlawful Alien") to include identical enhancements based on the number of aliens smuggled provided "a more direct measure of the scope of the offense."  Id. at 259.  The Commission

5

explained that U.S.S.G. § 3B1.1 ("Aggravating Role") generally provided for an increase of 2, 3, or 4 levels for organizers, managers, and supervisors in large scale cases, and the enhancement pertaining to the number of aliens was designed to work in conjunction with the operation of the role enhancements from § 3B1.1. Id. at 259-60. Section 2L1.2 was amended to follow the same structure. Id. at 260.

I accepted that, as a general matter, the seriousness of the offense increases based on the number of fraudulent documents produced, and while the Commission did not provide much of an explanation for why it chose the specific numbers it did, the enhancement was at least generally linked to another enhancement for aggravating role. However, in amendment 544, effective May 1, 1997, in direct response to a congressional directive in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the Commission increased the base level from 9 to 11, and the enhancement for number of documents from 2, 4, and 6, to 3, 6, and 9, respectively. Id. at 393-94. This amendment was not the product of the Commission acting in its characteristic institutional role of basing changes on study or expertise, and guidelines that simply follow congressional directives are entitled to less respect. See United States v. Castillo, 695 F.3d 672, 674 (7th Cir. 2012); see also United States v. Reyes-Hernandez, 624 F.3d 405, 418 (7th Cir. 2010) ("Kimbrough instructs sentencing courts to give less deference to guidelines that are not the product of the Commission acting in 'its characteristic institutional role,' in which it typically implements guidelines only after taking into account 'empirical data and national experience.'").

Under the version of the guideline in effect in 1996, defendant's adjusted level would have been 15, and the final level 13, for a range of 12-18 months. That range would, as defendant noted, fall into Zone C of the sentencing table, permitting a so-called split sentence

of ½ prison and ½ community confinement, see U.S.S.G. § 5C1.1(d)(2), although community confinement was not an option in this case due to the Immigration and Customs Enforcement ("ICE") detainer on defendant.

Looking to the specifics of this case, defendant agreed that the enhancement for more than 100 documents technically applied. However, he argued that the photos found on his computer did not necessarily establish that he created more than 100 counterfeit documents. He claimed that a number of the photos on the computer were present before he used the equipment. He admitted that he delivered false documents for another person before he got into the counterfeiting business himself, which should be considered as part of his relevant conduct, but the exact number was unknown. In that situation, he was being held responsible for the conduct of another, more culpable co-conspirator, who actually mentored him in the business. Given the total number of documents the evidence suggested defendant and his associates created, I did not see this as a significant mitigating factor. The guideline actually provides for an upward departure in cases involving substantially more than 100 documents, see U.S.S.G. § 2L2.1 cmt. n.5, and courts have upheld above-guideline sentences on this basis, see, e.g., Castillo, 695 F.3d at 675. While I accepted that for a time defendant worked as a deliveryman for another, perhaps making him less culpable, he later started producing documents on his own.

Second, I took into account defendant's motive to commit the crime – financial desperation after he lost his job and ability to support his girlfriend and her three children. I also noted that he engaged in the conduct so that other immigrants could find work in the country, not in order to allow them to commit other, unrelated crimes. As indicated, he started out working for another person, delivering the false documents for a time, then bought a

7

computer and started doing it himself to make additional money.

Third, I took into account defendant's lack of any prior record and his pending removal from the country, both of which reduced the need for a lengthy prison term to protect the public and deter him.  It was also relevant that during his time in the country, even though he was without legal status, he generally acted pro-socially, working, even filing taxes, albeit under a false name.

Fourth, I considered the added punitive aspect of the removal.[1]  Defendant had been in the United States for many years and had few ties to Mexico, which made deportation harder for him.  See United States v. Ferreria, 239 F. Supp. 2d 849, 855 (E.D. Wis. 2002) (departing downward based on the harsh consequences of deportation for a defendant who came to the United States as a teen and lived here for twenty-five years).  He did appear to have a plan in place on his return to Mexico, however, which decreased the likelihood of a quick and illegal return to the United States.

Finally, I took into account the additional time defendant was likely to remain in ICE custody before he was actually removed.  While this period could not be identified with precision, defendant presented evidence from an ICE agent suggesting a delay of three weeks to two months.  See United States v. Lugo-Nunez, No. 11-CR-3, 2011 WL 2414566, at *6 (E.D. Wis. June 10, 2011) (indicating that a defendant arguing additional hardships due to his deportable status should present evidence or data in support of his claims).

As indicated, defendant requested a sentence of 4 months, essentially time served; he noted that with the additional period he would likely remain in custody pending removal, he

---

[1]Not all offenders in this type of case are removed.  Fraudulent documents can be created by U.S. citizens, as well as undocumented individuals like defendant.

would serve about 6 months, the confinement portion of a split sentence under the alternate calculation discussed above.  However, I found that such a sentence would be insufficient to reflect the seriousness of the offense, promote respect for the law, and deter others. Defendant argued that he did not understand the seriousness of his conduct at the time, but I could not really accept that as a significant mitigating factor.  Defendant knew or should have know that what he was doing was wrong and that his use of false social security numbers of others could wreak havoc in their lives.

Under all the circumstances, I found a sentence of 8 months sufficient but not greater than necessary to satisfy the purposes of sentencing.  This term approximated a sentence at the low end of the alternate range discussed above (12 months and 1 day), less the approximately 2 months of good time credit a defendant could receive on such a sentence, less another 2 months to account for additional time spent in ICE custody.

### III.  CONCLUSION

For the reasons set forth herein, I committed defendant to the custody of the Bureau of Prisons for 8 months.  Based on his financial situation, I determined that he lacked the ability to pay a fine and so waived a fine.  Finally, I imposed no supervised release, consistent with U.S.S.G. § 5D1.1(c).

Dated at Milwaukee, Wisconsin, this 4th day of September, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

9